354 So.2d 1311 (1978)
Robert M. DUPAS, Jr., Plaintiff-Appellant-Relator,
v.
CITY OF NEW ORLEANS, Travelers Insurance Company and William O. Brown, Defendants-Appellees-Respondents.
No. 60163.
Supreme Court of Louisiana.
January 30, 1978.
Rehearing Denied March 3, 1978.
*1312 Gerald P. Aurillo, Metairie, for plaintiff-appellant-relator.
James L. Selman, II, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Philip S. Brooks, City Atty., Gerald A. Stewart, Asst. City Atty., New Orleans, for defendants-appellees-respondents.
TATE, Justice.
While crossing a roadway, the plaintiff Dupas, a pedestrian, was struck by a police vehicle driven by the defendant Brown. He sues Brown, the latter's employer (the City of New Orleans), and their insurer for severe personal injuries sustained. The trial and intermediate courts dismissed Dupas's suit on the ground of his contributory negligence. 346 So.2d 322 (La.App. 4th Cir. 1977).
The accident occurred at about 9:00 p. m. on a very dark night. The plaintiff Dupas was struck by the defendant Brown's vehicle while Dupas was crossing a deserted roadway. Brown, a police officer, was traveling slowly without headlights and in complete darkness, in an attempt to surprise some suspected rabbit hunters.
*1313 We granted certiorari, 349 So.2d 874 (La.1977), because we entertained doubt that, under the circumstances, the inattentiveness of the pedestrian constituted contributory negligence.
For reasons to be stated, we find that the pedestrian took adequate precautions against injury from oncoming motor traffic to be reasonably expected. Such traffic would be using headlights as required by law, unlike Brown's darkened vehicle, and the lights would alert him to its approach. The pedestrian was not contributorily negligent in failing to anticipate and guard against the grossly negligent approach of a vehicle down the highway in complete darkness.

Principal Issue
As the court of appeal correctly found, the motorist Brown's conduct was grossly negligent, however commendable the purpose in attempting to arrest illegal rabbit hunters. Our essential inquiry, therefore, is whether Dupas's conduct, under the circumstances, subjected himself to unreasonable risk of injury so as to constitute contributory negligence.
As we summarized in Smolinski v. Taulli, 276 So.2d 286, 290 (La.1973) (citations omitted):
"Contributory negligence is conduct on the part of the plaintiff which falls below the standard to which he should conform for his own protection. The standard of conduct to which the plaintiff must conform for his own protection is that of a reasonable man under like circumstances. The party relying upon contributory negligence has the burden of proving it.
"Failure to take every precaution against every foreseeable risk or to use extraordinary skill, caution, and foresight does not constitute negligence or contributory negligence. . . . [The victim] is required only to use reasonable precautions, and [his] conduct in this regard is not negligent if, by a common-sense test, it is in accord with that of reasonably prudent persons faced with similar conditions and circumstances."

Context Facts
In main outline, the facts are relatively undisputed:
On the evening of the accident there had been radio reports of unidentified flying objects (UFO's) in the skies over New Orleans East. The plaintiff Dupas and his brother-in-law, Knickmeyer, had gone to a deserted section of the area to watch for them, taking a pair of binoculars.
Dupas and Knickmeyer had stationed themselves on opposite sides of the south incline of an overpass over Interstate Highway 10. The overpass was situated in swamplands and dead-ended on both sides, having been built in anticipation of future development.
The only traffic using the overpass was the occasional vehicle which used the overpass as a turnaround to transfer from one side to the opposite-bound other side of the limited-access Interstate Highway. (During the hour or more the UFO-watchers were there before the accident, only two vehicles used the overpass. Both of them were police vehicles, one of them Brown's vehicle which struck Dupas.)
Dupas and Knickmeyer had one pair of binoculars between them. They would each scan the skies with naked eyes, and the person using the binoculars would raise them from time to time to examine more closely a suspected UFO. At intervals, one or the other would cross over to take the binoculars and use them himself for a while.
The UFO-watchers were in complete darkness on this very dark night. They took no precautions to alert oncoming traffic to their presence. Rather (see discussion below), they relied upon their own notice of the lights of oncoming vehicles to move out of the roadway.
These pedestrians had stationed themselves on the south side of the overpass, about 60 feet below its crest. In the meantime, the motorist Brown had stationed his darkened police vehicle on the other (north) *1314 side of the crest, about 30 feet below it, to watch for illegal rabbit hunters. Due to the crest between them, neither party was in a position to observe the other, aside from the extreme darkness of the night.
Brown thought he observed a vehicle leave the Interstate and shine a spotlight into the marshes, as if rabbit hunting. The vehicle was at the north of the overpass, perhaps on an access road. In order to catch the hunters in the act, Brown quietly started his car and proceeded without lights, completely darkened, at a slow (quiet) speed of 15 mph. His intention was to turn around at the bottom of the south end of the overpass and to return to the north end to check the activity of the occupants of the vehicle.
After Brown had cleared the crest, he saw a pedestrian (the plaintiff Dupas) crossing the roadway, binoculars to eyes, about 10 feet in front of him. Tr. 80-81. At the time, Dupas had just crossed the midline of the roadway into Brown's southbound lane, crossing it apparently proceeding towards the other (west) side.
Brown's vehicle struck Dupas in Brown's southbound lane just over the center-line, Tr. 95, about 65-75 feet below the crest.
Brown had also glimpsed the other pedestrian (Knickmeyer) stationed on the east side of the overpass, facing westerly towards his path.

Dupas's Contributory Negligence
The previous courts held that Dupas was contributorily negligent in observing for UFO's while on the traveled portion of the roadway, inattentive to oncoming traffic. We think that, in so doing, they overlooked the importance all participants attached to the lighting by headlights to alert them to the presence of other vehicles on this completely darkened and deserted stretch of roadway, and its significance in determining whether Dupas was contributorily negligent under the circumstances.
While the defendants argue that Dupas was oblivious to any oncoming traffic whatsoever, a fair reading of the evidence as a whole indicates that, while watching for UFO's, Dupas and Knickmeyer also kept a lookout for oncoming headlights.
In describing Dupas and his conduct,[1] Knickmeyer testified that he and Dupas kept a lookout for automobiles coming up on that overpass as well as looking for UFO's. He testified, Tr. 404-05:
"We wasn't watching the binoculars constantly, we were watching for UFO's and watching for traffic, that's how we seen the first truck that came up because the lights would reflect up there before the vehicle would even get on the overpass."
This testimony was corroborated by the testimony of Officer Boepple. He had driven a police truck up the south incline of the overpass about thirty minutes before the accident, in connection with his own investigation of UFO sightings. His police vehicle, unlike Brown's, made full use of its headlights.
As he came up the overpass, Boepple noticed the reflectors of the plaintiff's parked motorcycle. Then, as he approached the crest, he saw the two pedestrians, one (Knickmeyer) leaning on the abutment and the other (Dupas) in the roadway in his path. As the police truck approached, Dupas moved over to the side of the road. Tr. 152.
Boepple testified, "once I got about 30 or 40 feet from him he [Dupas] moved out of the way ["off the street"], he saw me coming." Tr. 159. Although Boepple was approaching at a speed of 20-25 mph, he wasn't required to stop to avoid hitting Dupas, instead he (Boepple) "came nowheres near making contact with him." Tr. 160.
Officer Boepple then stopped, conversed about UFO's, and casually cautioned the pedestrians to be careful. (They, of course, thought they were acting carefully, in getting *1315 off the roadway (if on it) when headlights alerted them to an oncoming vehicle.)
The defendant Brown's testimony itself indicates the importance of headlights in alerting persons on or near the overpass to the approach of oncoming traffic from either side of the overpass.
The care Brown took to darken his own vehicle, so as not to alert suspected hunters of its presence, illustrates this. Further, in describing his ability to see the outside (west) wall on the other (south) side of the crest of the overpass from his parked position on the north incline, he observed: "You could only see to the crest unless the car was coming up the other side." Tr. 76. (In context, we take this to mean that he could not see beyond the crest unless headlights of oncoming traffic outlined the structure.)
Under these circumstances, Dupas was exercising reasonable care to protect himself from oncoming traffic reasonably to be expected. He and his companion relied on the headlights, either coming up the incline on his side of the overpass or else illuminating the crest if coming from the other side, of oncoming traffic to alert them to the approach of the isolated vehicle which might exceptionally use the deserted dead-end overpass.
In crossing the darkened roadway without observing for the approach of an illegally darkened vehicle, which he could not reasonably anticipate, Dupas did not act with unreasonable disregard of his own safety. We cannot say that a pedestrian is negligent simply because he crosses a deserted roadway at night, nor in failing to anticipate that from the total darkness ahead a darkened vehicle will come upon him as he crossed the center-line.[2] As we noted earlier, "Failure to take every precaution against every foreseeable risk or to use extraordinary skill, caution, and foresight does not constitute negligence or contributory negligence."
In Law v. Osterland, 198 La. 421, 3 So.2d 680 (1941), we held that a pedestrian who crossed a roadway in the face of oncoming lights of trafficin what the court of appeal had held to be grossly negligent conductwas not contributorily negligent in assuming that the oncoming motorist was approaching in accordance with traffic laws. (In fact, the motorist was speeding at an excessive rate.)
Citing well-settled jurisprudence, we stated, 3 So.2d 683: "* * * `A pedestrian should use ordinary care for his own safety when crossing a street or highway; however, he has the right to assume that others will use a like care to avoid injuring him. Failure to anticipate omission of such care does not render the pedestrian negligent as a matter of law.'"
See also: Brantley v. Brown, 277 So.2d 141 (La.1973); Duffy v. Hickey, 151 La. 274, 91 So. 733 (1922); Carpenter v. Hartford Accident & Indemnity Co., 333 So.2d 296 (La.App. 1st Cir. 1976); Normand v. Piazza, 145 So.2d 110 (La.App. 4th Cir. 1962).
Here, for instance, in all probability the accident would not have occurred if the headlights of Brown's vehicle had been shining, since its approach could then have been seen by Dupas or his companion in their lookout, as the lights outlined the crest of the overpass before it crossed it (and all the more readily after the vehicle came over the crest onto the southerly incline). Dupas could then have desisted from crossing or have stepped back into the opposite lane so as to avoid the vehicle.
Further, if the headlights had been shining, Brown himself could have seen Dupas in the roadway as he came over the crest, instead of when only 10 feet from him, and could have easily stopped (at 15 mph), slowed, honked his horn to alert the pedestrian, or otherwise have avoided the accident, even though the pedestrian himself *1316 was unaware of his approach. Brown would thus have been liable, if he had failed to avoid the accident, if he had been shining his headlights as required by law. See, e. g., Pierre v. Landry, 341 So.2d 891 (La.1977); Guilbeau v. Liberty Mut. Ins. Co., 338 So.2d 600 (La.1976). It would be an anomalous result that he could escape present liability because his negligence was of a grosser nature, i. e., driving a vehicle on the roadway completely without lights to observe persons on it or to alert them of his approach.

Conclusion
The plaintiff Dupas's recoveries are not barred by contributory negligence, as held by the previous courts. He is thus entitled to recovery for damages which resulted from Brown's tort. However, as a matter of present preferable policy, we usually do not fix quantum where neither the trial nor the intermediate court has passed upon this question. See, e. g., Smolinski v. Taulli, 276 So.2d 286 (La.1973). Instead, we remand the proceedings for such purpose.
For the reasons assigned, the judgments of the district court and of the Court of Appeal, Fourth Circuit, are reversed insofar as they dismiss the demand of the plaintiff. The case is remanded to the Court of Appeal, Fourth Circuit, in order that it may fix the damages to which the plaintiff is entitled; and for such court to render judgment for such sums against the defendant. All costs are taxed against the defendant.
REVERSED AND REMANDED.
MARCUS, J., dissents and assigns reasons.
SUMMERS, J., dissented.
MARCUS, Justice (dissenting).
I consider that Dupas subjected himself to an unreasonable risk of injury under the circumstances. Accordingly, I agree with the courts below that his contributory negligence was a proximate cause of the accident thereby barring his right to recover. I respectfully dissent.
NOTES
[1] Due to brain injury suffered as a result of the accident, Dupas himself was not mentally able to give significant testimony.
[2] We pretermit whether, if Dupas had looked, the defendants have preponderantly proved that he could have observed the dark object approaching. The vehicle's driver did not see Dupas until within ten feet of him. Tr. 80-81. Brown also testified that he could see no more than 10-15 feet ahead of him, as he proceeded without headlights down the darkened slope. Tr. 116.